## HAGAN v. WARD et al.

(Supreme Court, Appellate Division, First Department. July 7, 1903.)

**1. SETTING ASIDE CONVEYANCE—FRAUD—EVIDENCE.**
   The evidence in an action to set aside a conveyance of an estate in remainder, the life tenant being still alive, in consideration of an annuity, *held* sufficient to sustain a finding that it was not obtained by fraud, though, in view of the grantor's early death, the consideration was small.

   Patterson and Hatch, JJ., dissenting.

Appeal from Special Term, New York County.

Action by Katherine C. K. Hagan against Sidney Ward and others. From a judgment entered on a decision of the court dismissing the complaint (77 N. Y. Supp. 893), plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Albert Stickney, for appellant.
Allan McCulloh, for respondents.

INGRAHAM, J. The plaintiff, as the next of kin and heir at law of Anna Sutherland, deceased, commenced this action to set aside a conveyance executed April 30, 1896, whereby Anna Sutherland conveyed to Louis V. Sone her interest, subject to certain life estates, in certain real and personal property in the city of New York and in the county of Westchester. The complaint alleges that this sale and transfer of her interest in this property was not made by the said Anna Sutherland of her own free will, but was obtained from her by the defendant Sone for a grossly inadequate consideration by fraud, duress, and undue influence practiced and brought to bear upon the said Anna Sutherland by said defendants. It appeared that at the time of this transfer the said Anna Sutherland was about 48 years of age, and her mother, Frances A. Skinner, the life tenant, was about 68 years of age; that the interest which the said Anna Sutherland had in this property was a vested remainder, acquired under the will of Francis C. Fleming, her brother. By the will of Francis C. Fleming, the testator, after the payment of certain specific legacies, gave to his executrix and executors, in trust, all the rest, residue, and remainder of his estate, real and personal, to pay to his mother, Frances A. Fleming (now Frances A. Skinner), and his father, Thomas Fleming, in equal proportions, the interest and income therefrom, and after the death of either to pay to the survivor the whole of the interest or income during his or her life; and after the death of both father and mother he devised one-third of the residue of his estate to the said Anna Sutherland. The defendant Sone was appointed an executor by the will of Frances C. Fleming, but refused to qualify.

Letters testamentary were issued to the testator's father, Thomas Fleming, and his mother, Frances A. Fleming; and after the death of Thomas Fleming, Frances A. Fleming, now Skinner, became the sole acting executor and trustee under this will, having power to sell and convey any and all real estate of which the testator died seised and possessed. There was also in the will of Francis C. Fleming a bequest of $50,000 to his executors in trust, the income to be paid to Mary C. Cowie, and upon her death one-third of the said $50,000 was to be paid to the said Anna Sutherland. Some time prior to April 30, 1896, Anna Sutherland had expended all of the property that she had inherited under the will of her father and brother, and was without money to supply her necessary living expenses. She had become indebted to people who had supplied her with necessaries, and her creditors were pressing for payment, and refused to give her further credit. She had quarreled with her mother, who was entitled to the life interest in the property, in which she had a remainder, and she refused to apply for assistance from her. She had become addicted to the use of alcohol, was incapable of earning any money, and was without resources except this interest in remainder. This, generally speaking, was the condition when her necessities compelled her to obtain some pecuniary assistance to pay her pressing indebtedness and support her for the rest of her life. All her property consisted of this remainder in an undivided interest in real and personal property left by her brother, in which her mother had a life estate and was sole trustee with a power of sale. In this emergency Mrs. Sutherland consulted Messrs. Cannon & Atwater, attorneys at law, to procure some money for her. Mr. Cannon, of that firm, applied to Mr. Sidney Ward, also an attorney at law, who was the attorney for the defendant Sone, to learn if Mr. Sone would make Mrs. Sutherland a loan. This application was followed by several communications from Mr. Atwater, which were introduced in evidence. The first letter would appear to have been dated the 14th of December, 1895. Mr. Ward appears to have made some examination as to the property. These negotiations continued until early in January, 1896, when Mr. Atwater applied to Mr. Sone for a loan to Mrs. Sutherland of a few thousand dollars, secured by a mortgage on her interest in the real estate, which Mr. Sone refused. Further applications appear to have been made to Mr. Sone to purchase some of Mrs. Sutherland's property, when, at the suggestion of Mr. Atwater, a physician employed by Sone called upon Mrs. Sutherland to ascertain her mental and physical condition, and made an examination, and reported the result of that examination to Mr. Sone. Before this examination there had been a proposition to Mr. Sone to purchase Mrs. Sutherland's interest in the property, he to make a cash payment, and to agree to give Mrs. Sutherland an annuity during her life. That physician reported to Sone that:

"Mrs. Sutherland is ill with ailments which render her recovery unlikely, if not impossible. I do not believe it is possible to forecast with any approach to certainty the duration of her life, for there are too many conditions involved. Her paralysis is of that type which is slowly progressive. But while it would undoubtedly cause death ultimately, I would incline to think that she is in greater jeopardy from intercurrent disease rather than

from it. Much depends upon herself. Indulgence of certain kinds would provoke gastritis, and likely a fatal issue. On the other hand, good nursing and the services of a skillful physician, such as she now has, might prolong her health for a considerable time. My impression is she cannot withstand the prostration which ensues in hot weather. It is more than likely she may succumb before that time by the indulgence above alluded to."

After this examination and report, on February 11, 1896, Mr. Atwater wrote to Mr. Ward that he had heard from Mrs. Sutherland that this physician had made a medical examination, and continued:

"Have you received the report, and are you in shape now to endeavor to agree upon an arrangement? As I told you on Saturday last, I am anxious to hurry it forward as much as possible. Whenever you are ready to take up the details of the agreement, I should be glad to call and talk them over with you."

The negotiations then continued. The suggestion came from Cannon & Atwater that Sone should agree to pay Mrs. Sutherland $4,000 in cash, and an annuity of $6,000 during her life, and $100,000 on the death of her mother if she should die within two years, or $50,000 if she lived over two years. This Sone refused as entirely out of the question. To induce Sone to make this agreement, statements were made to him that Mrs. Sutherland was ill, and could not live a great while; and it was to ascertain the truth of this statement that Sone, at the suggestion of Cannon & Atwater, instructed his physician to examine Mrs. Sutherland. Sone testified that he was anxious to do something for Mrs. Sutherland, as he understood that she was in need of money, and he made a calculation as to the amount that it was safe for him to advance upon this property. His estimate disclosed the fact that, upon the basis which was finally adopted, if Mrs. Sutherland lived 11 years, he would have to pay out as much cash as her entire interest in the estate, leaving out of the question an instrument which Mrs. Sutherland had executed, which it was claimed imposed an incumbrance upon the property. On March 5, 1896, there was submitted to Mrs. Sutherland a statement of the real and personal estate of Francis C. Fleming, deceased, which showed the total of the estate to be $338,145.54, and this was submitted to Sone. On March 7, 1896, Mr. Atwater, acting for Mrs. Sutherland, wrote to Mr. Ward in relation to this statement of the Fleming estate. He estimated the total value of the estate at $350,000, and that, leaving out of consideration the $50,000 in which a Mr. Cowie had a life interest, the money that would be distributed upon the death of Mrs. Skinner, the life tenant, could be roughly stated at $300,000, and in this Mrs. Sutherland had a present vested interest of one-half ($150,000). The letter then continued:

"My proposition is that she sell this entire interest to Mr. Sone, to be paid for by him on the death of Mrs. Skinner, when the estate comes into possession, and in consideration of his advancing her a sum of money in hand sufficient to pay off her debts, and enough to enable her to arrange herself on a new footing, which at the outside will be $6,000, and agreeing to pay her for the balance of her life time or until the death of Mrs. Skinner $6,000 a year quarterly, in January, April, July, and October, Mrs. Sutherland will sell this interest at a price less than its apparent value. The price to be paid to be determined in this way: Upon the death of Mrs. Skinner the value of the property to be agreed upon by Mrs. Sutherland or her personal representative and Mr. Sone, and, in case they are not able

to agree, then the value to be fixed by apraisers to be chosen in the usual manner, and Mr. Sone to pay the valuation agreed upon or appraised, less a percentage to be determined by the number of years Mrs. Skinner lives."

It was stated then that Mrs. Sutherland was perfectly willing to make a very liberal concession for present assistance; that she must have enough money to make her comfortable for the balance of her life; that whether, on her death, she leaves a larger or smaller estate, was of very little importance to her. This letter was submitted to Mr. Sone, who said that he would not entertain that proposition; and that ended the negotiations. On April 1, 1896, Mrs. Sutherland reopened the negotiation by a letter to Mr. Ward, which was as follows:

"Dear Sir: After consulting with my friend, Mr. Jenkinson, concerning my affair, I have come to the conclusion to offer Mr. Sone, through you, my entire interest in my late brother Francis C. Fleming's personal and real estate property, for the following consideration: Mr. Sone to pay my debts, not exceeding $6,000. Mr. Sone to pay me the yearly allowance for the rest of my life $6,000 per annum. At Mrs. Skinner's death, if she dies within two years, Mr. Sone to pay me or any person or persons I may designate, the sum of $75,000 in cash. If Mrs. Skinner should survive longer than the said two years, Mr. Sone to pay me or any person or persons I may designate the sum of $50,000 cash only."

This letter was transmitted to Mr. Ward, and by him submitted to Mr. Sone, who, after some consideration, authorized Mr. Ward to submit a counter proposition to Mr. Atwater, which Mrs. Sutherland did not accept; but on April 11, 1896, there was submitted on behalf of Mr. Sone a final proposition, which Mrs. Sutherland accepted, and it was this agreement that was formally executed on the 30th of April.

During the balance of Mrs. Sutherland's life Mr. Sone complied with all the conditions imposed upon him by the agreement, and paid to Mrs. Sutherland an amount exceeding $14,000, and under the agreement he agreed to pay an additional sum upon the death of Mrs. Skinner. For this he received a transfer of all of Mrs. Sutherland's interest in the Fleming property. During all this period, and down to the time of her death, Mrs. Sutherland attended to her own business. Her correspondence shows that she actually appreciated her condition and necessities. She understood perfectly well the property that she had, and the disposition that she desired to make of it, and endeavored to procure for herself as much as she could. There is certainly in this evidence not one suggestion that this agreement was made at the solicitation of Sone, or that he in any way suggested to or induced Mrs. Sutherland to transfer the property to him. All of the solicitations came from her and her attorney. Mr. Atwater, acting at her suggestion, made the first proposition to make Mrs. Sutherland a loan, and subsequently her attorneys made the first suggestion of a sale of her interest in the property; and when the final proposition by her attorney was rejected by Mr. Sone she renewed the proposition for a sale upon more advantageous terms to him, when Sone, upon a full examination of the conditions, made his final proposition, which he adhered to. That proposition was accepted by Mrs. Sutherland after consultation with her attorneys,

with full appreciation of its effect, and perfectly understanding the disposition that she made of her property. Certainly a finding based upon this evidence that this agreement was induced by fraud or undue influence would be contradicted by all the evidence introduced by the plaintiff, and would be without the slightest support. It was Mrs. Sutherland that solicited Mr. Sone to make the purchase, and, so far as appears, it took from December to April to induce Sone to make any proposition for a purchase of the property. It may be conceded that Mrs. Sutherland's necessities were very great, so great in fact that the immediate effect of her failure to obtain money had a much greater influence upon her mind than the amount of money that she would leave upon her death. But the evidence is that she had no one in whom she was sufficiently interested to make it important for her to leave any considerable property in comparison with an arrangement which would make her comfortable for the rest of her life. This property was hers, and she could do with it as she pleased. If she considered that her own comfort, with the certainty of a liberal support for the rest of her life, was of more importance to her than the interest of those who should succeed her, and made an arrangement, without any fraud or undue influence practiced upon her, which assured her comfort and absence from care for the rest of her life, there is certainly no basis for a court of equity to set aside that arrangement because its ultimate result would inure to the benefit of the only one who was willing to assist her at this critical period of her life. She could have given this property away if she pleased, but, instead of doing so, she transferred it to Mr. Sone for a consideration which assured her comfort for the rest of her life. That this agreement was not solicited by Sone, was not proposed by him, and was accepted by him only after long negotiations, during which Mrs. Sutherland had competent legal advice and understood perfectly well what she was doing, is proved by uncontradicted evidence, and, if Mrs. Sutherland's mental condition was such that she could appreciate and understand what she was doing, and deliberately made this agreement, which in its substantial details was proposed by her and approved by her legal adviser, I am unable to see any principle upon which a court of equity can interfere.

The learned counsel for the appellant lays great stress upon the inadequacy of the consideration paid by Sone to Mrs. Sutherland for this transfer of property, and claims that the agreement should be set aside because advantage was taken by Sone of her necessities to procure from her an unconscionable agreement. But in considering this we must look at just what Sone acquired. He acquired a remainder in an estate where nothing could actually come to him until after the death of Mrs. Skinner, a life tenant, who was about 68 years of age. $50,000 of the property was tied up during the lifetime of another person, whose age I do not find stated. The property in the meantime was in the hands of a trustee, whose management of the estate had, to say the least, not been satisfactory. The amount of property that would be finally received would necessarily depend upon the management of the trust during the lifetime of the life beneficiary, and, looking back at the situation from our present

standpoint, it would appear that the transaction was a very advantageous one for Mr. Sone. Mrs. Sutherland had a right to make it. It insured her living in comfort for the remainder of her life, and enabled her to enjoy her own property. When the action was commenced, Mrs. Skinner was still alive, and there was no certainty then as to when Sone would receive any of the property, or be repaid the advances that he had made. It is insisted, however, that this must be treated as from the standpoint at the time Sone made the agreement; that from the report of the physician he was justified in assuming that Mrs. Sutherland would live but a few months, and thus the total amount that he would be required to pay would be the $6,000 in cash at the execution of the agreement, and one or two of the quarterly payments on the annuity. As a matter of fact, Mrs. Sutherland lived for about 18 months after the execution of this agreement, and there was certainly nothing in the situation that presented itself at the time the agreement was made that made it impossible that she should live for several years. Undoubtedly, the fact that she was addicted to the use of alcohol would tend to shorten her life, and, living as she did, it was quite doubtful whether the habit that she had acquired could be changed; but Sone had a perfect right to refuse to make any agreement with her. He was under no obligation to furnish her with any money to support her. He made no application to her to buy her property, and had the right to impose the terms upon which he would make these advances. No one else could be procured who would supply her with any money to relieve her necessities, and, while it may be said he drove a hard bargain with Mrs. Sutherland, it was still a bargain. He imposed the terms upon which he would furnish her with what she required, and she accepted those terms; and the mere fact that her necessities compelled her to accept those terms is no reason for taking away from him a purchase which he has made without fraud or deceit, without solicitation or undue influence, simply because the amount that he will receive will be in excess of what he paid.

But we are not now considering the question as to whether or not there was any evidence to sustain a judgment for the plaintiffs. The question is whether a finding by the trial court that the agreements referred to in the complaint "were negotiated for, made, executed, and delivered by Anna Sutherland of her own free will, for an adequate consideration, with the advice and assistance of able and reputable counsel selected by herself; and that said Anna Sutherland at the time of such execution and delivery thereof, and during the negotiations leading thereto, was competent to negotiate for and make and execute the same. That said transfers were not obtained from her for an inadequate consideration, nor by any fraud, duress, undue influence, or harsh or oppressive use of her necessities," is sustained by the evidence. The utmost that can be said is that there was a question for the trial judge, upon the facts disclosed, as to whether or not this transfer was made under such circumstances as to constitute a fraud upon the grantor; and the finding of the trial court was certainly conclusive upon that subject.

There was much evidence as to the habits of Mrs. Sutherland, and

the effect of the excessive use of alcohol upon her, but there was no evidence to justify a finding that she had not sufficient mental capacity to execute a contract or conveyance; and the evidence is undisputed that she perfectly well understood what she was doing when she made this conveyance—a conveyance affecting property that belonged to her, and of which she had a right to make any disposition that she desired. The physician that attended her from January 23, 1895, to the date of her death, September 16, 1897, was called by the plaintiff, and testified that while the diseases from which she suffered, and which ultimately caused her death, were caused by an excess of diet and stimulants, he never saw her intoxicated at any time, or even under the influence of liquor, either in 1895, 1896, or 1897, and never saw anything that indicated mental trouble; that she was bright and intelligent, and a person of refinement; that on all ordinary occasions when the physician saw her she seemed in full possession of her faculties. And the evidence is undisputed that down to the time of the execution of this agreement she continued to transact her own business, controlled her household, and exhibited no evidence of a weak mind, or lack of sufficient intelligence to transact ordinary business and to make any disposition of her property that she pleased.

There are objections to evidence, but they present no question that requires discussion, and I am clearly of the opinion that there is nothing in this record that would justify us in disturbing the finding of the trial judge.

It follows that the judgment should be affirmed, with costs. All concur, except PATTERSON and HATCH, JJ., who dissent.